302 Ga. 333
FINAL COPY

S17A1153.  ANGLIN v. THE STATE.

PETERSON, Justice.

Nehemiah Anglin appeals his conviction for felony murder and marijuana possession following the death of Damion Wright.[1]  Anglin argues that the trial court erred by admitting (1) testimony that he put a "hit" on the State's primary witness; (2) evidence of his alleged membership in a gang, including evidence of his tattoos; (3) other evidence he says is hearsay; (4) security camera footage; and (5) testimony concerning the credibility of a witness.  He also argues that

---

[1] Wright was killed in March 2014.  Anglin was indicted on June 26, 2014 on seven counts: malice murder, felony murder (aggravated assault), felony murder (possession of marijuana), aggravated assault, possession of marijuana (more than one ounce), and two counts of possession of a firearm during the commission of a felony.  At an August 2015 trial, the jury found Anglin not guilty of five counts, but guilty of Count 3 (felony murder, with marijuana possession as the predicate felony) and Count 5 (marijuana possession).  The trial court sentenced Anglin to life in prison on the felony murder count and merged the possession of marijuana count into felony murder.  Anglin filed a motion for new trial, which he subsequently amended.  The judge denied Anglin's motion for new trial on July 1, 2016.  Anglin filed a notice of appeal on July 11, 2016, and this appeal was docketed to the term beginning in April 2017 and submitted for decision on the briefs.

trial counsel rendered ineffective assistance for failing to object to certain jury charges and that the evidence was insufficient to sustain his convictions. We find that the evidentiary decisions of which Anglin complains either did not amount to an abuse of the trial court's discretion or were harmless error. We also find that Anglin's claims of deficient performance by counsel are either without merit or abandoned, we reject his argument that the evidence was insufficient to support his convictions, and we affirm.

The evidence presented at trial showed as follows. Wright was fatally shot outside of an apartment complex in late March 2014, after meeting Anglin.[2] Daniel Squires, indicted with Anglin on all of the charges, testified for the State.[3] According to Squires, Anglin had a telephone conversation with Wright in which Anglin agreed to purchase three ounces of marijuana for $800. Wright's wife, Latoya Wright, testified that she overheard her husband talking on the telephone and arranging a meeting before he went out the night he was

---

[2] Police began getting calls about the shooting on March 27, 2014, shortly after midnight.

[3] Squires testified that, as a result of being arrested for Wright's murder, his probation on a burglary conviction was revoked and he was resentenced to twenty years, to serve ten in prison, with the proviso that he would testify truthfully in Anglin's case. Squires said he anticipated receiving a plea deal of a ten-year concurrent sentence for one count of aggravated assault in the case stemming from Wright's death.

killed. She said she heard her husband complain that the other party had not shown up for a meeting planned for earlier that day and tell the caller that he would have his gun with him, lest the other person "try anything funny[.]"

Squires testified that James Valentine drove him and Anglin to meet with Wright. Squires and Anglin got into Wright's car at a QuikTrip convenience store ("QT"), and Wright drove the car to a nearby apartment complex. Anglin gave Wright money in exchange for the drugs but complained that he could not smell the marijuana and handed it back to Wright. Wright pulled out a gun and told Squires and Anglin to get out of the car. A struggle ensued, and Anglin grabbed the gun and hit Wright in the head with it a few times before Wright got out of the car, saying "y'all got it." At that point, Squires testified, Anglin exited the car, pointed the gun at Wright, and fired a single shot toward Wright, from a distance of ten to twenty feet. Leaving the drugs behind, Squires and Anglin ran to the nearby QT, where Valentine picked them up.

The State tried to establish, in part through Squires's testimony, that the circumstances of the murder could be explained by Anglin's affiliation with the Bloods gang. Squires testified at trial about a prior drug transaction in which Wright pulled a gun on Anglin and Valentine, angering Anglin. Squires also

3

testified that Valentine was a member of the Bloods gang, while Anglin (like Squires) was merely an affiliate, still in need of earning the gang's trust before he could become a member. Additionally, during a recorded interview that was played for the jury, Squires described an incident after the shooting in which he was beaten by several fellow inmates on a jail bus. In this interview, Squires mentioned rumors that he heard that Anglin was trying to "get [him] eight," meaning hurt Squires. Squires also reported the words of an unidentified inmate in the Bloods gang, who told him that the reason for the beating was that Anglin said Squires was "snitchin' on him."

The State also called Irungo Tate, who said he had spoken with Anglin after the shooting while both of them were in jail. Tate testified that Anglin had told him about the shooting, saying that he and Squires[4] "ran up on" a drug dealer as he was getting out of his car and "there was some shots fired," although Anglin did not say who shot the dealer. Tate recalled hearing Anglin say that Squires was "snitching" and he was arranging a hit on Squires. Tate also testified that Anglin told him about being in the Bloods gang and that he had seen tattoos on Anglin, one of which was "M.O.B.," a tattoo that Tate said

_____

[4] Tate testified about Squires using Squires's nickname, "Block."

Anglin told him meant "Member of Blood."

Two other eyewitnesses to the shooting, Llasman Felix and Laporscha Mitchell, also testified. Felix testified for the State that he saw one person start running away from an argument, and another person follow and shoot him from about 30 feet away, but he was not able to identify the shooter at trial. Mitchell, called by the defense, also testified that she saw the shooting. She testified that she had known Anglin[5] through a mutual friend for two years prior to the shooting and that he was not one of the men that she saw at the apartment complex that night.

Police found a bag containing 2.93 ounces of marijuana on the driver's side floorboard of Wright's car. A detective testified that Anglin's fingerprint was on the bag. The medical examiner testified that Wright, who wore eye glasses, had a deep laceration in the web space of his right hand, consistent with someone wrenching a gun out of it, and a small abrasion over the left forehead, consistent with someone knocking his glasses off. Forensic evidence indicated that Wright was killed by his own gun from a distance of greater than ten feet; the gun was found in a wooded area behind the QT.

---

[5] Mitchell testified that she knew Anglin by his nickname "Miami."

5

Anglin did not testify at trial, but the State played an audio recording of a police interview of him. After being dropped off by Valentine, Anglin told police, he met Wright at the QT. Anglin then got into the car with Wright and purchased a small amount of marijuana. Afterward, Anglin said, he went into the QT, leaving Wright — still alive — behind in the parking lot. Anglin said he was not present when Wright was shot.

1. Anglin first argues conclusorily that the evidence against him was insufficient. Having reviewed the evidence presented at trial, we conclude that the evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Anglin was guilty of the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Anglin argues that the trial court erred by admitting statements by Squires that Anglin had put a hit out on him. We find that these statements were cumulative of other evidence, and thus any error in their admission was harmless.

The admission of evidence is committed to the sound discretion of the trial court, and the trial court's decision whether to admit or exclude evidence will

6

not be disturbed on appeal absent an abuse of discretion. See Young v. State, 297 Ga. 737, 739 (2) (778 SE2d 162) (2015). Anglin argues that Squires's testimony about the attack on the bus was hearsay because he lacked personal knowledge of Anglin being involved, while the State argues that the statements at issue were admissible for nonhearsay purposes such as to explain the motivations of Squires's attackers. But even assuming without deciding that the admission of the statements was an abuse of discretion, we conclude that any such error was harmless and thus does not merit reversal. Under the new Evidence Code, applicable to the 2015 trial of this case, "[e]rror shall not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected[.]" OCGA § 24-1-103 (a). And the erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced. See United States v. Means, 695 F2d 811, 818 (5th Cir. 1983) (erroneous admission of hearsay was harmless where cumulative of testimony by numerous witnesses).[6] Here, the trial court admitted

---

[6] Where provisions of the new Evidence Code are borrowed from the Federal Rules of Evidence, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Fifth Circuit. See Olds v. State, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016).

the recording of Squires's interview based on the State's proffer that Squires would testify, and that Tate would testify that Anglin told him he arranged for the hit on Squires. Tate testified as much later; the references in Squires's interview to "rumors" and a statement by another inmate that Anglin had arranged a hit on him thus were cumulative of Tate's testimony. Tate's testimony — based on Anglin's own statements — was at least as compelling as those references in Squires's interview. And Anglin does not challenge the admission of Tate's testimony on this point. Thus, even if Squires's recorded statements included speculation and hearsay, any error in their admission was harmless.

3. Anglin argues that evidence of his alleged membership in a gang should have been excluded because there was no evidence the crime was gang-related, and the evidence of gang membership was highly prejudicial to him. The decision to admit the gang evidence was a question committed to the discretion of the trial court, see Young, 297 Ga. at 739 (2), and we conclude the trial court did not abuse its discretion in this regard.

Anglin acknowledges that evidence regarding gang membership may be relevant to show motive. See United States v. Harrell, 737 F2d 971, 978 (11th

8

Cir. 1984); Wolfe v. State, 273 Ga. 670, 674 (4) (a) (544 SE2d 148) (2001).[7]

But he contends there was no evidence presented at trial to show that the charged crimes were motivated by gang membership. We do not read the record this way. Squires testified that Anglin was seeking membership into the Bloods gang and thus in need of earning the gang's trust. The State later called an expert witness who testified that the "code" of being in a gang required violent responses to being threatened. Squires testified that Wright pulled a gun on Anglin in a prior meeting.[8] Wright's widow testified that Wright warned a caller just before setting out the night he was killed that he would have his gun in case the caller tried "anything funny." And Squires testified that Wright, indeed, brought a gun to the fatal meeting with Anglin. This testimony enabled the State to explain why Anglin shot Wright, while leaving the drugs behind at the scene. The evidence of gang membership thus was relevant to and probative

---

[7] OCGA § 24-4-418 provides for the admission of "evidence of the accused's commission of criminal gang activity" where the defendant is charged under OCGA § 16-15-4, which is not at issue here. But OCGA § 24-4-418 (c) provides that this evidentiary rule is not the exclusive means to admit evidence of criminal gang activity. See Lingo v. State, 329 Ga. App. 528, 531 (765 SE2d 696) (2014) (physical precedent only) (analyzing the admission of evidence of gang affiliation under OCGA § 24-4-404 (b)).

[8] Although his testimony was confusing on this point, Tate also suggested that Anglin informed him that the victim previously had pulled a gun on him.

of motive.

Under OCGA § 24-4-403, "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" It is true that evidence of gang membership can be highly prejudicial. See Lingo v. State, 329 Ga. App. 528, 532 (765 SE2d 696) (2014) (physical precedent only), cited in Shaw v. State, 301 Ga. 14, 19 (2) (799 SE2d 186) (2017). But in a criminal trial, inculpatory evidence is inherently prejudicial; "it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion." United States v. Edouard, 485 F3d 1324, 1346 (11th Cir. 2007) (citation and punctuation omitted; emphasis in original). And

> Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility. Thus, in reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact.

Id. at 1344 n.8 (citations and punctuation omitted). We cannot say that the trial court abused its discretion in performing the balancing required by the rule.

4. Anglin also argues that the trial court erred in admitting evidence of his tattoos. We disagree.

10

Anglin argues that evidence of his tattoos should not have been admitted for the same reasons we already have rejected in Division 3. He also argues that the photographic evidence should not have been admitted because there was no probable cause for the warrant. In considering this argument on appeal, we must assess whether the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant by reviewing the search warrant application to determine the existence of probable cause under the totality of the circumstances. Glispie v. State, 300 Ga. 128, 132 (2) (793 SE2d 381) (2016). We give "substantial deference" to the magistrate's decision to issue the warrant, which need only to have been "a practical, common-sense decision" as to whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. (citation and punctuation omitted).

After Anglin had been arrested for Wright's murder, an officer sought a search warrant to view and photograph tattoos on Anglin's body and averred that Anglin had been identified as the person who shot Wright, that the suspects in the case were identifying themselves as members of the Bloods gang, and that Anglin had several gang tattoos on his body. The officer stated that he was

11

requesting the ability to photograph Anglin's body "to identify known gang tattoos to conduct a follow up and possibly charge Anglin under the Georgia Street Gang Act."

This information was sufficient to establish probable cause. The State can prove a violation of the Georgia Street Gang Terrorism and Prevention Act by showing that a defendant is a member of a "criminal street gang" and committed a violent act intended to further the interests of that gang. See Jones v. State, 292 Ga. 656, 659 (1) (b) (740 SE2d 590) (2013); OCGA § 16-15-3 (1) (J); OCGA § 16-15-4 (a). Although the officer may have had further work to do in order to make a case that Wright's murder was committed in furtherance of the gang's interests, his information that gang members were involved created a "fair probability" of such, and evidence of Anglin's tattoos then would be relevant to establish that he was a member of the gang. The trial court did not err in declining to suppress the photographs on the basis of the inadequacy of the warrant.

Anglin also argues that the warrant was improper because compelling Anglin to lift up his shirt to be photographed violated his right against self-incrimination under the Georgia Constitution. See Ga. Const. 1983, Art. I, Sec.

12

I, Par. XVI. Assuming Anglin even preserved this ground for appeal,[9] we previously have rejected an indistinguishable argument in another case. See Ingram v. State, 253 Ga. 622, 634 (7) (323 SE2d 801) (1984) (right against self-incrimination was not violated by requiring defendant to strip to the waist to allow police to photograph tattoos on his body).

5.   Anglin next argues that the trial court erred by permitting hearsay testimony by Latoya Wright, the victim's widow.   We find that any error was harmless.

The State argues that the widow's testimony regarding a telephone conversation between her husband and another person was admissible under the doctrine of forfeiture by wrongdoing.  See Hickman v. State, 299 Ga. 267, 272 (4) (787 SE2d 700) (2016) (citing OCGA § 24-8-804 (b) (5)).   Anglin argues that this doctrine does not apply because there is no evidence that he acted with the purpose of preventing Wright from appearing against him as a witness, but we need not resolve the question.  In its closing argument, the State relied on this testimony to argue that Wright had shown disrespect toward Anglin's gang

_____

[9] The record does not appear to reflect any objection to admission of the photographs on that basis.

13

by complaining about the caller not appearing for a previously-scheduled meeting and by threatening to bring a gun to their planned drug transaction, causing Anglin to respond violently pursuant to the gang's code of conduct. In that sense, it was not offered for the truth of the matter asserted (that Wright actually brought a gun) and thus was not hearsay. See Strickland v. State, 257 Ga. 230, 232 (3) (357 SE2d 85) (1987) (error to exclude on hearsay grounds testimony regarding death threat made against the defendant, as it was not offered to prove the truth of the substance of the threats but to show why defendant purchased a gun). To the extent it was offered to show that Wright actually brought a gun to the meeting with Anglin, Latoya Wright's testimony was cumulative of other evidence from multiple sources — Squires's testimony that Wright pulled a gun on him and Anglin, the medical examiner's testimony Wright had an injury consistent with someone wrenching a gun out of his hand, and forensic evidence indicating that Wright was killed by his own gun. Thus, to the extent that Latoya Wright's testimony about what she heard was offered for the truth of the matter asserted, its admission could not have been harmful. See Means, 695 F2d at 818.

6. Anglin also raises multiple challenges to evidence that the State

14

presented regarding whether he was seen on security camera recordings from the QT that he claimed to have visited after buying drugs from Wright. We find that any error regarding the admission of this evidence was harmless.

The security video was admitted as an exhibit — over a defense objection for lack of foundation — but was not played for the jury. Instead, the State elicited Detective Michael Freer's testimony that Anglin did not appear on the video. Freer testified that another detective (not Freer) reviewed the video. The State attempted to ask Freer whether the other detective told him whether or not Anglin is seen on the video, but the defense objected on hearsay grounds before Freer responded to the question. The trial court overruled the objection, but the prosecutor nonetheless rephrased his question:

> Q. Maybe if I ask it this way. Was there any evidence developed during the investigation that Mr. Nehemiah Anglin was in the QT as he claimed during his interview when this murder happened?
> A. Not according to that video.
> Q. And other than his own claim to be there, any other evidence that supports that?
> A. No, sir.

Anglin argues that the admission of the security video footage from the QT was error because the State failed to authenticate the videotape or lay a proper foundation for its admission. But the record indicates that the video was

never played for the jury. Any error in its admission thus was harmless. See Huckeba v. State, 217 Ga. App. 472, 476 (4) (458 SE2d 131) (1995) (no reversible error where appellant did not show harm from introduction of videotape that was never played for the jury).

Anglin also argues that the admission of Freer's testimony was error because it was hearsay. He appears to be correct; the record indicates that Freer's testimony about the contents of the security video was not based on his personal knowledge, but based on what a different officer, who reviewed the video, told him. See Jackson v. State, 301 Ga. 866, 870 (4) (804 SE2d 367) (2017) (noting, in case applying new Evidence Code, that "an investigating officer may not testify about what others told him during his investigation merely under the guise of explaining the officer's conduct") (citation and punctuation omitted); compare United States v. Perez-Lopez, 262 Fed. Appx. 974, 980 (11th Cir. 2008) (no hearsay where agent's testimony "did not include any statements from other agents" and "appear[ed] to have been based on her personal participation in the coordinated investigation"). But we conclude that any error in admission of Freer's testimony was harmless, given the strength of the State's case.

"The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." Smith v. State, 299 Ga. 424, 432 (2) (d) (788 SE2d 433) (2016) (citations and punctuation omitted). It is highly probable that the admission of Freer's testimony did not contribute to the verdict. The State's case against Anglin was strong. Squires testified that, during a purported drug transaction, he saw Anglin grab Wright's gun, hit him in the head, then shoot him. Squires's testimony was corroborated by that of Tate, who testified that Anglin admitted to being involved in an encounter in which he and Squires "ran up on" a drug dealer. Other evidence corroborated the accounts of Squires and Tate: Felix's eyewitness testimony that he saw one person start running away from an argument, and another follow and shoot from about 30 feet away; Anglin's fingerprint found on the bag of marijuana found in Wright's car; medical evidence that Wright had been hit on the head; and forensic evidence that Wright was killed by his own gun, fired from more than ten feet away.

Additionally, the State presented evidence that Anglin had arranged for a "hit" on Squires. Squires's and Tate's testimony to that effect was corroborated by testimony from sheriff's deputies who saw Squires after he was

17

apparently beaten on a bus. "[E]vidence of a defendant's attempt to influence or intimidate a witness can serve as circumstantial evidence of guilt." Kell v. State, 280 Ga. 669, 671 (2) (a) (631 SE2d 679) (2006); see also United States v. Hammond, 781 F2d 1536, 1540 (11th Cir. 1996) (considering evidence under Rule 404 (b)). The State also presented evidence that Anglin's motive to kill Wright was gang-related. Evidence that the killing was gang violence likely struck a powerful blow to the defense case. Given that evidence, as well as the rest of the State's strong case, it is highly probable that Freer's testimony about the security camera footage did not contribute to the verdict. See Dawson v. State, 300 Ga. 332, 335 (3) (794 SE2d 132) (2016) (any error in admitting factual basis for similar transaction via hearsay was harmless given overwhelming evidence of guilt directly inconsistent with appellant's defense); Soto v. State, 285 Ga. 367, 371-372 (2) (c) (677 SE2d 95) (2009) (any error in admitting hearsay statements harmless given overwhelming evidence of defendant's guilt).

7. Anglin argues that the trial court erred by admitting testimony by Detective Freer concerning the credibility of Laporscha Mitchell, the eyewitness whom Anglin called at trial. We disagree.

18

After the defense rested its case, the State recalled Freer as a rebuttal witness, asking him several questions about his interview of Mitchell the night of the murder. On cross-examination, the defense asked Freer about his failure to include his interview of Mitchell in the case file that he provided to prosecutors. Defense counsel asked Freer whether he had ever "disregard[ed] the testimony of your only eyewitness because you didn't feel like they were sober enough" and if there was "any other evidence out there of who shot Damion Wright that you have just decided wasn't good enough to go in your report?" On redirect, the State elicited the testimony that is the subject of Anglin's argument on appeal, asking Freer whether he thought the information that Mitchell had was reliable enough to identify any perpetrator. Over a defense objection that this asked Freer to comment on Mitchell's credibility and invade the province of the jury, Freer testified that he thought Mitchell's opinion as to the identity of the perpetrators was not reliable given factors such as darkness and her vantage point, and that he was particularly unwilling to rely on what she said given that she refused to give the name of the person she was with.

"[The c]redibility of a witness is not beyond the ken of the jurors but, to

19

the contrary, is a matter solely within the province of the jury." Manzano v. State, 282 Ga. 557, 560 (3) (b) (651 SE2d 661) (2007) (citations and punctuation omitted); see also OCGA § 24-6-620 ("The credibility of a witness shall be a matter to be determined by the trier of fact, and if the case is being heard by a jury, the court shall give the jury proper instructions as to the credibility of a witness."); Adkins v. State, 301 Ga. 153, 158 (3) (a) (800 SE2d 341) (2017) (applying no-bolstering rule under new Evidence Code). But a trial court does not abuse its discretion in allowing an officer to explain his course of conduct when it is challenged, even when that incidentally results in what might be read as a comment on the veracity of a witness. See Adkins, 301 Ga. at 159-160 (3) (b) (no abuse of discretion in allowing officer to testify that his "instinct" was that witness knew the shooter despite her statements to the contrary, subsequent to defense questioning as to why officer did not ask witness to describe specific facial features of the suspect). To the extent that Freer's testimony could have been understood to comment on Mitchell's credibility, the defense by its questioning of Freer opened the door to the testimony of which Anglin complains. The trial court thus did not abuse its discretion in allowing the testimony in question.

20

8. Finally, Anglin argues that his trial counsel rendered ineffective assistance of counsel by failing to object to certain jury instructions. Anglin makes no meritorious argument that any of the referenced actions of counsel constituted deficient performance.

In order to establish that trial counsel was ineffective, Anglin must show both that trial counsel's performance was deficient, and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). "The failure to pursue a futile objection does not amount to ineffective assistance." Ventura v. State, 284 Ga. 215, 218 (4) (663 SE2d 149) (2008). In considering a claim of ineffective assistance, "we independently apply the legal principles to the facts." Robinson v. State, 277 Ga. 75, 76 (586 SE2d 313) (2003) (citation and punctuation omitted).

(a) Anglin finds fault with his counsel's failure to object to various aspects of the trial court's instruction to the jury under Allen v. United States, 164 U.S. 492 (17 SCt 154, 41 LE 528) (1896). For one, he notes that the charge did not include language "that no juror is required to surrender his or her opinion because of the honest different opinion with another juror or other jurors, for the

21

purpose of reaching a unanimous verdict," arguing that such language was required by the Court of Appeals' decision in Greeson v. State, 138 Ga. App. 572, 573-574 (3) (226 SE2d 769) (1976). But we subsequently reversed that holding as inconsistent with Spaulding v. State, 232 Ga. 411, 413-414 (4) (207 SE2d 43) (1974), in which we approved an Allen charge that did not include such language. See State v. Greeson, 237 Ga. 193, 193 (1) (227 SE2d 324) (1976). Anglin also argues that counsel should have objected to the portion of the trial court's Allen charge in which the court told jurors, "Each of you took an oath to render a verdict. Each of you must come to a decision on each count. There is no, I can't make a decision. You must make a decision on each count individually." Anglin argues that this language, coupled with the instruction that "a unanimous verdict is required[,]" was too coercive because it suggested to jurors that they were violating their oath if they did not reach a verdict. But a charge is erroneous only if "considered as a whole, [it] was so coercive as to cause a juror to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." Humphreys v. State, 287 Ga. 63, 81 (9) (b) (694 SE2d 316) (2010) (citation and punctuation omitted). In its Allen charge, the trial court also told jurors that "this verdict must be the

22

conclusion of each juror and not a mere acquiescence of jurors in order to reach an agreement[.]" The trial court told jurors the case had been submitted to them for a verdict "if possible" and that their duty was to decide the issues "if [they could] conscientiously do so." The trial court's admonition that "each" juror must reach a decision, with no option to conclude that they "can't make a decision," appears to have been in response to an earlier indication that one juror was "undecided" as to one of the charges. Considering the charge as a whole, we conclude that it was not erroneous and any objection by counsel would have been futile. See Drayton v. State, 297 Ga. 743, 748-750 (2) (b) (778 SE2d 179) (2015) (given instruction as a whole and circumstances of cases, "a unanimous verdict is required" instruction not unduly coercive).

(b) Anglin argues that counsel was ineffective for failing to object to the charge on his alleged affiliation with a gang. He contends that the instruction was "highly prejudicial," did not fit the evidence in the case, and amounted to an improper comment on the evidence by telling jurors that they had heard "testimony as to the Defendant's alleged affiliation with a violent gang." But this was a limiting instruction that evidence of gang affiliation could be considered only for the purpose of establishing or explaining the motives of

23

Anglin or other witnesses. The jury did hear "testimony as to the Defendant's alleged affiliation with a violent gang." Far from a comment on the evidence, the instruction told jurors that the trial court's decision to admit this evidence "in no way" suggested whether Anglin was in fact affiliated with a violent gang or that such affiliation explained anyone's motives. Trial counsel's failure to object was not deficient performance.

(c) Anglin also argues that trial counsel rendered ineffective assistance of counsel by failing to object to the trial court's statement to the jury after recharging on party to a crime, "Now I want you to remember — I know that there's a lot of counts. There's a lot of evidence." Anglin contends that this was an improper comment that bolstered the State's case in a matter in which, in fact, there was not a lot of evidence. But in context, it is clear that this was not a comment on the strength of the State's case but a word of encouragement to jurors, who already had asked multiple questions, including asking less than an hour into their deliberations what would happen if they were hung on every count, and appeared puzzled as the trial court gave the recharge on party to a crime. The trial court continued after the remarks Anglin challenges on appeal, "We've been working long and hard and the law is confusing. But I hope that

24

helps you." Trial counsel's failure to object was not deficient performance.

(d) Finally, Anglin argues that trial counsel also rendered ineffective assistance for failing to object to the court's failure to give Anglin's requested charge regarding what may serve as a predicate felony for felony murder. But the trial court gave a modified version of the requested charge, and Anglin does not attempt to explain on appeal why the alterations amounted to error, other than a conclusory assertion that his requested charge was necessary and properly tailored to the evidence and that no other charge adequately covered the issue that it addressed. Anglin also fails to make any argument that he was prejudiced by the charge as given by the court. We thus deem this claim abandoned. See Supreme Court Rule 22 ("Any enumerated error not supported by argument or citation of authority in the brief shall be deemed abandoned.").

Judgment affirmed. All the Justices concur.

Decided October 16, 2017.

Murder. Cobb Superior Court. Before Judge Grubbs.

The Merchant Law Firm, Ashleigh B. Merchant, John B. Merchant III, for appellant.

D. Victor Reynolds, District Attorney, Michael S. Carlson, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General, for appellee.