**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: March 4, 2025

S25A0032. COLLINS v. THE STATE.

PETERSON, Presiding Justice.

Quame Lamar Collins appeals his convictions related to the armed robbery of three men, resulting in the deaths of Eddie Louis Grubbs and Marshall Jordan and injuries to Walter Smith.[1] Collins

---

[1] The shootings occurred on January 23, 2017. On August 3, 2017, a Burke County grand jury indicted Collins, charging him with malice murder and felony murder based on the killing of Grubbs (Counts 1 and 2), malice murder and felony murder based on the killing of Jordan (Counts 5 and 6), armed robbery (Count 3), possession of a firearm during the commission of a crime (Counts 4, 7, and 9), aggravated assault against Smith (Count 8), and possession of a firearm by a convicted felon (Count 10). At a bifurcated trial in June 2021, the jury found Collins guilty on all counts. On June 21, 2021, the trial court sentenced Collins to two consecutive life sentences without parole for the counts of malice murder (Counts 1 and 5), a consecutive life sentence for armed robbery (Count 3), consecutive 5-year sentences for possession of a firearm during the commission of a crime (Counts 4, 7, and 9), a consecutive 20-year sentence for aggravated assault (Count 8), and a consecutive 10-year sentence for possession of a firearm by a convicted felon (Count 10). Although the trial court purported to merge the felony murder counts, those counts were actually vacated by operation of law. See *Whittaker v. State*, 317 Ga. 127, 138 (5) (891 SE2d 849) (2023). On July 2, 2021, Collins made a timely motion for a new trial, which was amended on May 16, 2024. After a hearing, the trial court denied Collins's motion for a new trial. On July 2, 2024, Collins timely filed a

argues that (1) the evidence was insufficient to prove guilt beyond a reasonable doubt; (2) the trial court erred by not granting his request for a mistrial; and (3) the trial court erred by admitting certain hearsay statements. We conclude that the evidence was constitutionally sufficient; Collins waived his right to complain about the trial court's denial of his motion for mistrial; and even if some of the alleged hearsay statements should have been excluded, their admission was harmless because they were cumulative of other, properly admitted evidence. Accordingly, we affirm.

The evidence at trial showed the following. In January 2017, Grubbs lived in a single-wide mobile home with his cousin, Robbie Freeman, and Freeman's girlfriend, Joyce Striggles Herndon. The mobile home had a small addition in the back, where Grubbs would play dominoes with his friends. On January 23, 2017, Grubbs was playing dominoes in the back room with Jordan and Smith. Herndon was sitting in the living room when she heard a knock on the door.

notice of appeal, and the case was docketed to the term beginning in December 2024 and submitted for a decision on the briefs.

Herndon answered the door, and a man she knew as "Fat Boy" asked to see Grubbs. "Fat Boy" was accompanied by a younger male, who looked middle-school-aged. Herndon let the two males into the mobile home and told them that Grubbs was in the back room. The two males went down the hallway into the back room and started shooting. Herndon heard two shots, ran out of the mobile home through the front door, and hid behind a tree. As she was running, Herndon heard two additional shots.

Grubbs's nephew, Anthony, who was working at his straw field adjacent to Grubbs's mobile home, testified that he saw a black Dodge Journey with a paper tag in his driveway the day of the shooting. Additionally, Roger Young, who worked for Anthony, was sitting on Anthony's porch when he saw two men running across the field in front of Grubbs's home. Young testified that one man was "heavyset," the other man was "slim," and Young heard gunshots shortly after the two men entered Grubbs's mobile home. Young then saw Herndon run out of the mobile home and the heavyset man run across the field into a black SUV. Young did not see the slim

man exit the mobile home.

After the shooters left, Anthony and Herndon went into Grubbs's mobile home. They found Grubbs dead in his chair, Jordan dead on the floor, and Smith sitting in his chair struggling to breathe. Herndon called 911 at 2:50 p.m., and officers arrived at the scene shortly thereafter.

Approximately ten minutes after arriving at the scene, an officer with the Burke County Sheriff's Office interviewed Herndon. During the interview, Herndon identified "Fat Boy" as a potential suspect. After a brief investigation, the officer concluded that Collins was associated with the nickname. Another officer, who was unaware that Collins was a suspect, showed Herndon a six-person photographic lineup that included Collins. Herndon identified Collins in the photographic lineup as the individual she knew as "Fat Boy." The day after the shooting, Jermaine Williams, who was a friend of the victims, showed Herndon a picture of Collins, and Herndon once again confirmed that Collins was the shooter.

During the processing of the scene, a GBI agent noticed that

4

Grubbs's front pants pocket was turned out and empty. Grubbs's wallet was later found in a driveway in South Augusta. Several days later, investigators obtained and executed a search warrant for Collins's cell phone data. The records revealed that on the day of the shooting, Collins's phone was turned off between 1:37 p.m. and 3:22 p.m.

On January 25 and 27, 2017, Georgia Bureau of Investigations Special Agent Mary Chandler met with Tonya Simmons, a friend of Collins's family, to discuss the shooting. At trial, the State called Simmons as a witness, but she denied speaking to Agent Chandler. As a result, the State introduced the recordings of these interviews to impeach Simmons's denials.

In the first recorded interview, Simmons stated that the day after the shooting she saw Collins meet with his mother, Uzetta Gresham, at a Sprint gas station in the Augusta area. While at the gas station, Simmons heard Collins tell Gresham that he and Chris Scott went to do a "lick," he shot "the guy," a woman ran out of the door, he chased her, the gun jammed, he was worried that this

woman could identify him, and that they ditched the "hot box" with the "paper tag." Simmons reiterated the same information in the second interview. During his deposition, Smith could not recall whether he saw the assailant. As a result, the State played a prior recorded interview of Smith taken the day after the shooting to refresh his recollection during the deposition. In the recorded interview, Smith stated that he saw the shooter and described the shooter as a "slender" man.

Young testified that Collins was the heavyset man he saw running from Grubbs's mobile home. On direct examination, Young stated that he "got a good look" at the heavyset man's face as the man was running across the field. But on cross-examination, Young admitted that he told investigators he did not see the heavyset man's face.

Herndon testified that she was standing about ten feet away from Collins after she opened the door for him on the day of the shooting and clearly saw his face. Herndon said that she would "never" forget his face.

1. Collins's first enumeration of error contends that the jury verdict "is contrary to the evidence and the principles of justice and equity," citing the general grounds, OCGA §§ 5-5-20, 5-5-21 and 5-5-25, and some unspecified special grounds, OCGA § 5-5-25. Collins does not support this enumeration of error with any citations to the record or argument that the trial court failed to exercise its discretion as the thirteenth juror. Thus, Collins has abandoned this argument under Supreme Court Rule 22. See *Sauder v. State*, 318 Ga. 791, 816 n.21 (7) (f) (901 SE2d 124) (2024) ("[Appellant] makes no specific argument and cites no authority to support any of these claims, so we do not address them.").

Instead, in this enumeration of error, Collins argues that the evidence was not sufficient to support his convictions as a matter of constitutional due process. "[I]n the past, in evaluating a trial court's denial of a motion for new trial on the general grounds," this Court has "performed or referenced a constitutional due process sufficiency-of-the-evidence review under" *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), although many of us

7

question that practice. *King v. State*, 316 Ga. 611, 617 n.8 (2) (889 SE2d 851) (2023) (collecting cases). And although enumerations of error cannot be expanded by arguments in the briefs, see *Mims v. State*, 310 Ga. 853, 854 n.2 (854 SE2d 742) (2021), Collins does argue that the evidence was insufficient to support his convictions. We need not consider today whether it is appropriate to review constitutional sufficiency when the appellant's enumeration of error is limited to general and special grounds, because the evidence against Collins was constitutionally sufficient. See *King*, 316 Ga. at 617 n.8.

When reviewing the sufficiency of the evidence as a matter of constitutional due process, we view the evidence in the light most favorable to the verdict and inquire whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." *Mims*, 304 Ga. at 853 (1) (a)

(citation and punctuation omitted).

In arguing that the evidence was insufficient, Collins contends that the testimonies of Smith, Young, and Herndon did not support the conclusion that he was the shooter and that Simmons's testimony should not be believed. Even if Smith's description of the shooter as a "slender" man did not match Collins's body type, there was more than sufficient evidence that Collins was involved as a party to the crime. See OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."); *Byers v. State*, 311 Ga. 259, 265 (1) (857 SE2d 447) (2021) ("[A] defendant need not be charged specifically as a party to the crime in order to support a conviction based on that theory."); *Powell v. State*, 291 Ga. 743, 745 (1) (733 SE2d 294) (2012) (holding evidence was sufficient to support the defendant's murder conviction as a party to the crime even assuming that the defendant's companion, and not the defendant, fired the fatal shot, as they were engaged in a common enterprise at the time of the shooting and it could be reasonably inferred from the

9

evidence that they shared a criminal intent). On three separate occasions, Herndon identified Collins as one of the individuals she let into the mobile home before hearing gunshots ring out. And although Young gave conflicting testimony about whether he "got a good look" at Collins when Collins was running out of the mobile home, "it is the role of the jury to resolve conflicts in the evidence[.]" *Green v. State*, 304 Ga. 385, 387-388 (1) (818 SE2d 535) (2018).

In addition to this eyewitness testimony, Simmons testified that Collins relayed details of the crime to Simmons that would be known only by the perpetrators. Collins challenges her credibility, as well as that of Young and Herndon, but this was a matter for the jury to resolve. "It is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Green*, 304 Ga. at 387-388 (1) (citation and punctuation omitted); see also *Coley v. State*, 305 Ga. 658, 661 (2) (827 SE2d 241) (2019) ("As long as there is some competent evidence, even though contradicted, to support each fact

10

necessary to make out the State's case, the jury's verdict will be upheld." (citation and punctuation omitted)); *Brooks v. State*, 298 Ga. 722, 722-723 (783 SE2d 895) (2016) (sufficient evidence of malice murder where, among other things, defendant provided specific details of the crime known only to the perpetrator). In short, the evidence was sufficient to support Collins's convictions.

2. Collins contends that the trial court erred in denying his motion for mistrial after the State introduced evidence of his alleged gang affiliation. Specifically, Simmons's first interview with Agent Chandler contains a brief discussion of Collins's potential affiliation with the "GD" gang. After this portion of the interview was played for the jury, Collins moved for a mistrial. The trial court denied the motion but offered to give a curative instruction, which Collins declined. Because Collins rejected the trial court's offer of a curative instruction, he "waived his right to complain about the trial court's denial of his motion for mistrial." *Dobbins v. State*, 309 Ga. 163, 166 (3) (844 SE2d 814) (2020); see also *Stephens v. State*, 307 Ga. 731, 740 (5) (b) (838 SE2d 275) (2020); *Brewer v. State*, 301 Ga. 819, 820

11

(2) (804 SE2d 410) (2017).[2] Accordingly, this enumeration leaves nothing for us to review.

3. Collins also argues that the trial court erred when it admitted Simmons's January 25 and 27 interviews because she was repeating information she heard from Gresham, rather than Collins, and thus the interviews contained inadmissible hearsay. But in the interviews, it is clear that Simmons was repeating certain admissions Collins made to her, so these statements are admissible as statements of a party opponent. See OCGA § 24-8-801 (d) (2). To the extent that Simmons was repeating statements Gresham made, they were cumulative of other evidence, and thus any error in their admission was harmless. See *Anglin v. State*, 302 Ga. 333, 335 (2)

---

[2] Some of us doubt the validity of a bright-line rule that any refusal of a curative instruction waives the right to appeal the denial of a mistrial. There may be some prejudicial matters as to which a curative instruction would be insufficient. But this case does not present that question. See *Perkins v. State*, 313 Ga. 885, 896-898 (3) (873 SE2d 185) (2022) (holding that the trial court's denial of the defendant's motion for a mistrial was not erroneous and a curative instruction was sufficient to remedy any alleged prejudice resulting from the witness's brief mention of the defendant's gang affiliation); *Smith v. State*, 302 Ga. 699, 701-702 (3) (808 SE2d 692) (2017) (holding that the trial court's denial of the defendant's motion for a mistrial was not erroneous and a "curative instruction was sufficient to counter any alleged harm caused by the witness's brief statement" about the defendant's involvement with drugs).

(806 SE2d 573) (2017).

"The admission of evidence is committed to the sound discretion of the trial court, and the trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion." *Anglin*, 302 Ga. at 335 (2). "And the erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced." Id. at 336 (2); see also *Campbell v. State*, 320 Ga. 333, 343 (3) (b) (907 SE2d 871) (2024) (holding that non-constitutional error is harmless when "it is highly probable that the error did not contribute to the verdict" (citation omitted)).

During her first interview with Agent Chandler, Simmons said, she was getting her information "from listening to her story, the mother's story, not from him, his mouth." And the "mother" was "saying something about a lady running out the back door" and trying to get Collins a lawyer. However, Simmons also stated that Collins told her this information directly. Because Simmons's story was hard to follow, Agent Chandler clarified that the information

13

was coming from Collins:

> CHANDLER: And the mother told him that he needed to tell that and turn himself in?
> SIMMONS: Well, well the mother said first get a lawyer. And so the lawyer, uh, could do something. You know, to take the case, you know —
> CHANDLER: Yeah
> SIMMONS: — the lawyer take the case —
> CHANDLER: And she told him that after he told her what happened?
> SIMMONS: Right, what had happened, yes.
> CHANDLER: That him and Chris Scott went to do a lick, and that they, uh, he shot the guy, that they, the woman ran out the door, he chased her but the gun jammed, couldn't shoot her, he's worried she can ID him, and then they ditched the hot box and they had put a paper tag on it, drive out tag on it, and that they ditched Chris's phone, and that he's hiding out at Georgetown and Chris is hiding out at Richmond Villas in Augusta? Is that correct?
> SIMMONS: Right, that's correct.
> CHANDLER: And they told you all that at a Sprint gas station?
> SIMMONS: That's what he was telling the mother.
> CHANDLER: Yeah, but you —
> SIMMONS: I was standing there, so I could hear it. I could hear him talking, yeah.
> CHANDLER: But then you asked him a couple of questions about it too, right?
> SIMMONS: Yeah, I did ask him — I asked him what "did you do wrong."

Collins admitted to Simmons that he shot "a guy," saying that he had no choice. In the second interview, Simmons confirmed that she

14

was present when Collins admitted to Gresham that he participated in the shooting. At trial, Collins objected to the recorded interviews, arguing that because Simmons was repeating statements "she heard from the mother," the interviews contained inadmissible hearsay. Because Collins was present when the statements were made, the trial court overruled the objection.

Collins argues that there is no evidence to support the trial court's conclusion that the statements were made by him or in his presence. We disagree. In the first interview, Simmons unequivocally stated that she heard Collins say he shot the victims, chased a woman out of the door, and ditched the "hot box" with the "paper tag." In the second interview, Simmons once again confirmed that Collins said he was the shooter. Thus, the trial court properly admitted those statements as statements by a party opponent. See OCGA § 24-8-801 (d) (2).

It is true that in both interviews Simmons also repeats statements that Gresham made, and it is arguably unclear whether Collins was present when those statements were made and thus

15

whether those statements would be admissible as adoptive admissions. See OCGA § 24-8-801 (d) (2) (B). But the information that Gresham provided to Simmons was cumulative of the information Collins provided directly. Thus, even assuming that the statements were inadmissible, any alleged error in admitting them was harmless. See *Anglin*, 302 Ga. at 335-336 (2); see also *Rutledge v. State*, 298 Ga. 37, 40 (2) (779 SE2d 275) (2015) (no harm from admission of hearsay that was "largely cumulative" of other, properly admitted testimony). Accordingly, Collins's claim fails.

*Judgment affirmed. All the Justices concur.*