**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0145
James Calhoun
v.
The State

On appeal from the Superior Court of Fulton County
No. 16SC143159

Decided: June 16, 2026

ELLINGTON, Justice.

A Fulton County jury found appellant James Calhoun, as well as his co-defendants James Sims and Jonathan Banks (together, "the defendants"), guilty of malice murder and other crimes in connection with the shooting death of Pamela Williams and the burglary of her home.[1] Calhoun contends that the trial

---

[1] The crimes occurred on November 30, 2013. On April 12, 2016, Calhoun was indicted along with his co-defendants, Banks and Sims, by a Fulton County grand jury for malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); felony murder predicated on burglary (Count 3); aggravated assault (Count 5); burglary in the first degree of Pamela Williams's home (Count 6); and possession of a firearm during the commission of a felony (Count 9). Banks was charged individually with felony murder predicated on possession of a firearm by a convicted felon (Count 4) and possession of a firearm by a convicted felon (Count 10). Sims was charged individually with burglary in the first degree of the home of Deborah Huddleston (Count 8), and Calhoun was charged individually with burglary in the first degree of the home of Corey Robinson (Count 7). The court severed Counts 7 and 8, and those charges were not presented to the jury.

court erred in admitting certain evidence, in denying motions for mistrial and to sever the defendants' trials, in charging the jury, and in allowing cameras in the courtroom. He also argues that he received constitutionally ineffective assistance of counsel. As we explain further below, with respect to some of these claims of error, Calhoun has not made any meaningful argument for why the claim should prevail based on the applicable law and the specific facts of the case, and so he has not carried his burden of

---

After a joint jury trial that began on September 27, 2016, Calhoun was found guilty on all charges. (The jury also returned guilty verdicts against Sims and Banks, both of whom filed separate appeals. See *Sims v. State*, ___Ga. ___, S26A0143 (June 2, 2026); *Banks v. State*, ___Ga. ___, S26A0144 (June __, 2026)). On December 15, 2016, the trial court sentenced Calhoun to life in prison with the possibility of parole for malice murder (Count 1); 20 years' probation, consecutive to Count 1, for burglary (Count 6); and five years' probation, consecutive to Count 6, for the firearm offense (Count 9). The remaining counts (Counts 2, 3 and 5) were vacated by operation of law or merged for sentencing purposes.

On December 1, 2016, Calhoun filed a premature motion for new trial, which ripened upon entry of the final disposition order. See, e.g., *Fripp v. State*, 322 Ga. 269, 269 n.1 (2025). Calhoun amended his motion for new trial on November 4, 2020. After a hearing, the trial court entered an order denying the motion for new trial on July 27, 2023. The trial court then vacated and re-entered the order with respect to Calhoun only on September 25, 2023. Calhoun timely filed a notice of appeal on October 2, 2023. On September 3, 2025, this appeal was docketed to the term beginning in December 2025, and the case was submitted for a decision on the briefs.

We note the almost seven-year delay in resolving Calhoun's motion for new trial and another two-year delay for the appeal to be docketed in this Court. The trial court apparently had not ruled on Calhoun's first new trial motion, filed in 2016, when Calhoun amended that motion in 2020. We "reiterate that it is the duty of all those involved in the criminal justice system, including trial courts and prosecutors as well as defense counsel and defendants, to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay." *Owens v. State*, 303 Ga. 254, 258 (2018) (quotation marks omitted).

2

showing error on appeal. As to those claims of error that Calhoun does support with argument, they fail for the reasons set out below.

In *Sims v. State*, ___ Ga. ___, S26A0143, slip op. at 2-8 (Ga. June 2, 2026), wherein we affirmed the convictions of one of Calhoun's co-defendants, we set forth the facts of this case as follows:

> Viewed in the light most favorable to the jury's verdicts, the trial transcript shows the following. On the evening of November 30, 2013, the defendants met in front of Sims's house in the Amhurst subdivision in Fulton County. The defendants' movements in and through the neighborhood that evening were witnessed by Jerry Link, the subdivision's security officer. At dusk, the defendants walked the short distance from Sims's house to Williams's house along a "cut," a makeshift footpath through neighboring yards in the Amhurst subdivision. At this point, Link lost sight of the defendants. Williams, who was home alone, called 911 at 8:07 p.m. to report suspicious activity outside her home. While she was on the phone with the 911 operator and his supervisor, she reported hearing people ringing her doorbell repeatedly, her dog barking, and then people entering her home. Williams hid in the closet of her master bedroom, crouching low and whispering to the 911 operator as the defendants searched her home for valuables. Then the 911 operator heard Williams scream. Shortly thereafter, the telephone connection was lost. Williams screamed because Banks had

3

discovered her hiding in the closet. Banks pressed his gun to Williams's head and shot her.

Although Williams's alarm system was armed, it was not triggered when the defendants entered her home because the patio window through which they entered did not have an alarm sensor. Instead, the alarm was triggered at 8:20 p.m., shortly after the police arrived and entered the house. Officer Michael Guin arrived at Williams's home at 8:14 p.m. and waited for backup to arrive. When Corporal Willis Reed arrived, they entered the home and found Williams breathing but unconscious, slumped to the floor in her bedroom closet with a gunshot wound to the head. Guin noticed that Williams had been hiding in a smaller "closet within the closet" and that her phone had fallen between her knees. Paramedics transported Williams to Grady Hospital. She died there on December 2, 2013. The cause of death was a single, contact gunshot wound to the head. The medical examiner testified that Williams likely would have been sitting on the floor, looking up at Banks, when he pressed the gun's muzzle to her forehead and shot her.

After Banks shot Williams, he and the others fled from the house on foot and, shortly thereafter, sped out of the neighborhood in their cars. Banks hid at the home of Sims's cousins, Cassandra and Joseph Hockaday. According to the Hockadays, who gave statements to the police and testified at trial, Banks admitted to them that he, Calhoun, and Sims had

broken into Williams's home. Banks confessed that, when he discovered Williams in her closet, he "accidentally" shot her. Banks also said he hid the murder weapon "somewhere around the [Hockadays'] house" but, later, he and Calhoun moved it.

In the following days, Banks called his mother several times. Banks's mother asked him whether he had been involved in the shooting, and Banks admitted that he "was back there." After the shooting, Banks told his father that "me and my crew f***** up." Banks's father reported this statement to an investigator. When Banks's father asked Banks whether he had shot and killed someone, Banks responded "I don't know." Banks also asked his parents for money so that he could "get out of town." Banks's father gave the police the street names of five people in his son's "crew." Shortly thereafter, the police obtained warrants for Banks, Calhoun and Sims, and they were arrested in mid-December of 2013.

Link, the subdivision's security officer, testified that, during the evening of November 30, as he patrolled the neighborhood in his car, he saw a group of young men, including Calhoun, Banks, and Sims, standing in front of Sims's house. Sims's and Calhoun's houses are near each other on the same street, and Banks was staying with Sims. Link saw Calhoun, Banks, and Sims enter a silver-gray car with two other people at around 7:40 p.m. He watched the car leave but did not follow it. About ten

minutes later, while Link was patrolling the subdivision, he saw the same silver-gray car parked on the side of the road near Williams's house. Link testified that he saw the car's interior lights turn on as several people exited the car. Then the car sped away. Given that the neighborhood had experienced "[w]ell over 150" burglaries, Link was suspicious of what he was seeing. He began scanning the area and saw Banks standing near a retention pond by Williams's house. He also spotted a group of young men, including Calhoun and Sims, standing behind her house.

Believing that the young men were returning to either Sims's or Calhoun's house by way of the path through the woods, Link drove back to Sims's home. When he got there, he did not see the men, but he saw a red Pontiac and a blue Chevy parked in front of Calhoun's house. Link had seen the defendants in those cars earlier in the day. He testified that he had recorded the tag numbers of those cars as well as the tag numbers for the silver-gray car. After a few minutes, Link returned to Williams's street to see if he could find the young men. As he passed by the home of Eddie Muhammad, he spotted a group of young men, including Calhoun, Banks, and Sims, running through the neighborhood toward the path that led back to their homes. Then, at 8:22 pm, Link saw the red and blue cars that had been parked in front of Calhoun's and Sims's houses speed out of the subdivision. Later that evening, Link shared this

information with the police.

The following day, Link discovered a jewelry box lying on the ground along the path he had seen Calhoun, Banks, and Sims use to flee after the shooting. Believing that the box may have been stolen from Williams, he called the police to collect it. In addition to the jewelry box, the police collected a ring box, a black hooded sweatshirt, and a black skull cap along the path through the woods near Williams's home. Link testified that, also on the day following the shooting, he saw Sims's mother cleaning out the garage and disposing of clothing, including an orange jacket matching one he had seen Sims wearing on the night of the shooting. Link also saw Calhoun "roaming around[,] looking at the ground" in the area where Link had discovered the jewelry box. Link testified that much of what he had seen concerning the defendants' movements from the night of the shooting had been recorded on his car's dash camera and that he turned those recordings over to the police. Several of those recordings were admitted in evidence and played for the jury.

Williams's immediate neighbors also testified concerning events on the night of the shooting. Louis Lindo testified that, as he was standing at the end of his driveway, he saw a group of young men walking toward Williams's house. Muhammad testified that his dogs were barking that evening like someone was walking by his house. Joshua Williams, who lived next door to Williams, saw a group of five

young men run from behind her house along the cut between their houses as he was getting clothes out of the trunk of his car. Yvens Resilard, whose home was located between Williams's and Sim's homes, testified that around 8:00 p.m., he heard his dogs barking excessively, and when he went downstairs to check on them, he noticed that his motion sensor lights were on. Derrick McKnight, who was visiting his sister, testified that he spotted a group of five young men lurking outside his sister's home. McKnight's sister's home was also located between Williams's and Sims's homes. When McKnight turned on the outside floodlights, he saw five young men wearing dark clothing. One wore a skull cap. McKnight observed the men "scatter" and try to "hide." The men then all ran off together in the same direction.

The State also admitted evidence of prior acts involving Calhoun and Sims. Marcus Greer, who was given immunity from prosecution in exchange for his cooperation, testified that he, Calhoun, Sims, and two others broke into Melissa Burke's home on January 13, 2013. Burke had been home alone when she heard the doorbell ring. From her upstairs window, she saw two young men at her front door. When they continued to ring her doorbell, Burke called 911. As she did so, the young men climbed through a second-floor window on the back of her home. They began searching for things to steal. Burke testified that she hid in the closet, but one of the young men found her. She saw the closet door

8

swing open, heard a gunshot, and realized that she had been shot. The shooter kept firing until his gun ran out of ammunition. Burke testified that someone said: "Man, she's dead. Let's just get out of here." As the young men left her home, they triggered her alarm system. The alarm system did not go off when they entered the home because they had entered through a window that did not have an alarm sensor. Burke identified Calhoun at trial as the man who shot her.

Monica Salinas, who lived in the Cooks Landing subdivision in Fulton County, testified that on September 18, 2013, she heard a doorbell ring and saw two young men standing outside her front door. When she did not answer the door, they rang her doorbell "20, 15 times consistently, just constantly ringing the doorbell." Moments later, her dogs started barking in the back yard. She called 911, and while she was on the phone, one of the men threw a rock through her window, shattering the glass. When the men spotted Salinas in the upstairs window, one threw a rock at her and then fled. Shortly thereafter, the two men were apprehended by the police. Salinas and a sanitation worker who saw the men fleeing from Salinas's home identified one of them as Calhoun.

On October 30, 2013, Corey Robinson's home in the Amhurst subdivision was burglarized. The burglars stole laptop computers, watches, a television, and a jewelry box. The police recovered a palm print from the home and later matched it to

Calhoun's palm print.

1.  Calhoun argues that the trial court abused its discretion when it admitted over objection "other acts" evidence pursuant to OCGA § 24-4-404(b) ("Rule 404(b)"), which impermissibly placed Calhoun's character in evidence. Specifically, Calhoun contends that the trial court abused its discretion in allowing Greer's testimony concerning the January 3, 2013, shooting of Burke and the burglary of her home because the prejudicial effect of the evidence outweighed its probative value and because there was insufficient evidence of Calhoun's involvement.[2] For the following reasons, we conclude that the trial court did not abuse its discretion in admitting the evidence.

Rule 404(b) provides, in pertinent part, that

> [e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

OCGA § 24-4-404(b); *State v. Jones*, 297 Ga. 156, 159 (2015) (Rule 404(b) "is, on its face, an evidentiary rule of inclusion which

_____

[2] Although Calhoun asserted in one sentence that the trial court "allowed the introduction of at least two non-relevant acts extrinsic to the case at bar," he discusses only the January 3, 2013, shooting. Because he has presented no argument with respect to a second extrinsic act, he has not carried his burden of proof with respect to it. See *Sims*, slip op. at 14 ("As a general matter, a legal argument in support of a claim of error on appeal involves the presentation of reasoning based on the law and the specific facts of the case aimed at persuading a court that the claim of error has merit.").

contains a non-exhaustive list of purposes other than bad character for which other acts evidence is deemed relevant and may be properly offered into evidence."). A party offering Rule 404(b) evidence must show that (1) it is relevant to an issue in the case other than the defendant's character; (2) its probative value is not substantially outweighed by its unfair prejudice under OCGA § 24-4-403 ("Rule 403"); and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act. See *Jones v. State*, 301 Ga. 544, 545 (2017). We review the trial court's decision to admit Rule 404(b) evidence for an abuse of discretion. See *Kirby v. State*, 304 Ga. 472, 479 (2018).

The State filed a notice of intent to admit evidence of the January 13, 2013, acts.[3] It sought to admit this evidence to show motive, intent, preparation, plan, knowledge, and absence of mistake or accident. At a pretrial motions hearing, the State argued that the January 13 crime was "identical ... with the exception of the specific location." Burke, like Williams, hid in her bedroom closet and spoke with a 911 operator while Calhoun, Sims, Greer, and others burglarized her house. Calhoun, upon discovering Burke, shot her. The State argued:

> [W]e wish to show their motive and intent of obtaining money and items of value[,] that they plan and prepare and have knowledge that this is what is going on because they have a modus operandi: Knocking on that front door, ringing the bell, and when no one answers, coming in through the back. They found both women in the closets, and there is

---

[3] This notice was not included in Calhoun's record, but it is in the record in co-defendant Banks's case.

11

no mistake or accident both women were shot.

In a written pre-trial order, the trial court set out its Rule 404(b) analysis and addressed all three prongs of the Rule 404(b) test. The trial court admitted the January 2013 act for purposes of showing "motive, intent, preparation, plan, knowledge, and absence of mistake or accident." It also ruled that the probative value of the evidence would not be substantially outweighed by any unfair prejudice and that there was sufficient proof of Calhoun's involvement in the acts. The trial court instructed the jury that it was to consider the prior acts evidence solely for the limited purposes for which it was admitted "and not for any other purpose."

With respect to the first part of the three-part Rule 404(b) test, "relevant evidence" is defined as that evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. See *Strong v. State*, 309 Ga. 295, 300–01 (2020). Although Calhoun argued that the Burke shooting "had little to no connection with the facts [of] the case he was being tried on," the record shows that it was relevant for the purposes for which it was admitted. It showed a similar intent to burglarize a home. *Hood v. State*, 309 Ga. 493, 500 (2020) ("[T]he relevance of other acts evidence offered to show intent is established when the prior act was committed with the same state of mind as the charged crime."). This prior act was also relevant to show absence of mistake or accident, as it was clear that, in both the charged crime and the prior act, the crew shot their victims as soon as they were discovered hiding. That members of the crew eliminate witnesses was relevant to rebut Banks's claim to the Hockadays that he shot Williams by accident. See *Hall v. State*, 322 Ga. 378,

12

383 (2025) (holding that evidence was properly admitted to show intent and absence of mistake or accident because the defendant claimed the shooting was accidental or in self-defense, making intent a material issue).

Rule 403, which governs the second part of the test, provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403 "is designed to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Strong*, 309 Ga. at 301 (quotation marks omitted). In this case, the probative value of the prior act was not outweighed by the danger of unfair prejudice.

In his appellate brief, Calhoun asserts that the evidence is inculpatory, but he makes no argument beyond that concerning the danger of unfair prejudice from this evidence. See *Anglin v. State*, 302 Ga. 333, 337 (2017) ("[I]n a criminal trial, inculpatory evidence is inherently prejudicial; it is only when unfair prejudice substantially outweighs probative value that the rule permits exclusion." (citation and punctuation omitted)).

On the other hand, the State argued that the evidence was probative of Calhoun's criminal intent. "Factors to be considered in determining the probative value of other act evidence offered to prove intent include its overall similarity to the charged crime, its temporal remoteness, and the prosecutorial need for it." *Hood*, 309 Ga. at 501 (citation omitted.) The charged crimes and the Burke incident bear striking similarities: Both show a burglary crew entering a home its members believed to be unoccupied, through a window unsecured by an alarm sensor, and then

13

stealing items from the home. In both instances, the armed burglars rang the doorbell multiple times to determine if anyone was home before climbing through an unsecured window in the back of the house. In both instances, a member of the crew discovered a homeowner hiding in a closet and shot her. Thus, the Burke incident had high probative value based on the number of similarities. See id. As for temporal proximity, the Burke incident was probative in that it occurred less than a year prior to the charged crimes. See id. With respect to prosecutorial need, the State needed the Burke incident to prove the defendants' shared criminal intent, as members of a burglary crew, to burglarize homes and eliminate witnesses. See *Hood*, 309 Ga. at 501 ("As we have explained, if the principal in the killing was not the defendant, … a question then would have arisen about whether the defendant was a party to the crime as an accomplice, which would have depended substantially upon [his] intent." (quotation marks omitted)). Further, the State had a strong need to use the evidence to rebut Banks's claim that he accidentally shot Williams. See *Hall*, 322 Ga. at. 383. Thus, even if the evidence contained some unfair prejudice to Calhoun as it showed that he was a person who had committed another crime, "we cannot say that the high probative value of this evidence was so outweighed by the danger of unfair prejudice that the trial court abused its discretion when it admitted it." *Hood*, 309 Ga. at 501 (citation omitted).

Finally, the other acts evidence "may be admitted if the court concludes that the evidence is sufficient for the jury to find by a preponderance of the evidence that the other act was committed." *Strong*, 309 Ga. at 301 (quotation marks omitted)). Here, as the trial court correctly concluded, there was sufficient evidence to prove that the prior burglary and shooting occurred and that Sims and Calhoun participated, given that Greer, who

14

was part of the robbery crew, testified to the events he witnessed. See *Harrison v. State*, 310 Ga. 862, 869 (2021). Consequently, we see no abuse of discretion in the admission of the other acts evidence.

2. Calhoun contends the trial court abused its discretion in denying his motion to sever the defendants' trials because the evidence offered against the other defendants pursuant to Rule 404(b) had a prejudicial "spillover effect" on him. We considered whether the defendants' trial should have been severed in *Sims*, slip op. at 19-21. Calhoun makes arguments similar to those raised by Sims, complaining generally about antagonistic defenses and the admission of prior acts evidence. However, Calhoun does not cite to specific facts in the record or make meaningful legal analysis tethering those facts to his contentions. In *Sims*, we concluded that the primary evidence against the three co-defendants came from the same sources: Link's testimony concerning his observations on the night of the shooting and Banks's admissions to the Hockadays. Further, the jury was instructed on the law concerning mere presence, mere association, and parties to a crime, and the defendants' defenses were not antagonistic to each other. All three denied being present and did not shift the blame to each other. Id. Finally, like Sims, Calhoun failed to carry his burden on appeal of showing that he was clearly prejudiced by a joint trial. Thus, for the same reasons that we rejected this claim of error in *Sims*, we reject it with respect to Calhoun. See id.

3. Calhoun contends that the trial court abused its discretion in allowing television cameras in the courtroom to cover the trial. In his appellate brief, he devotes one short paragraph to this claim of error, asserting that allowing media access caused the "due process and truth finding function of the

15

judicial" system to be "usurped by the presence of media, who were there for the main purpose of evoking sympathy for the victim and contaminating the potential jury pool." However, Calhoun does not cite to any record evidence or make meaningful legal argument with reference to the applicable law as to *how* the trial court abused its discretion in permitting television media access.[4] As we explained in *Sims*, "[a]s a general matter, a legal argument in support of a claim of error on appeal involves the presentation of reasoning based on the law and the specific facts of the case aimed at persuading a court that the claim of error has merit." Slip op. at 14. Calhoun has not made such an argument; therefore he has not carried his burden of showing any abuse of discretion in the trial court's ruling. See *Sims*, slip op. at 14-16.

4. Calhoun contends that the trial court erred in denying his motions for mistrial after the admission of the following evidence: (a) Link's testimony that the red and blue cars parked in front of Sims's and Calhoun's homes were allegedly engaged in criminal activity in the neighborhood; (b) Link's testimony concerning the "negative activities" in which the red and blue cars were allegedly involved; and (c) a life-sized replica of the victim's closet (a demonstrative aid constructed in the courtroom), which

---

[4] The record reveals that the trial court entered an order granting television media access to the court room after "having considered Superior Court Rule 22 and OCGA § 15-1-10.1." The trial transcript also shows that, although Calhoun objected to the cameras being present as they were being set up in the courtroom, he made no legal argument expressly contesting the basis for the court's order. Instead, counsel simply stated: "We know that it's up to the Judge regarding if all the factors have been met under Rule 22." Although Calhoun references OCGA § 15-1-10.1 in his appellate brief, he does not present any argument explaining how "in utilizing" that statute, the "court erred in allowing the trial to be filmed." And Calhoun does not discuss Superior Court Rule 22 at all.

16

Calhoun was unable to see into as Officer Guin testified about it. Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Wilkerson v. State*, 317 Ga. 242, 249 (2023) (quotation marks omitted). As explained below, Calhoun has not carried his burden of showing that the trial court abused its discretion.

(a) Link testified that he "called Fulton County to have the tags run because, again, I had reports on a vehicle that matched that from other residence[s] that were involved." Banks' attorney interrupted Link's testimony and moved for a mistrial on the ground that Link "brought out yet more incidents that are allegedly involving the red [car] and blue car ... which impermissibly place[d] his character in issue because [Banks] is supposedly the driver of the red car." Calhoun joined in the motion without further argument. Outside the presence of the jury, the State explained that the other incidents were not connected to the defendants, and the State did not expect Link to testify about the other incidents involving those vehicles. The court denied the motion and, before the jury was called back into the courtroom, the prosecutor instructed Link that he was "not to talk about other crimes for which the red [car] and the blue car might be associated with that you know about."

The trial court did not abuse its discretion in denying this motion for a mistrial. The objection cut Link's testimony short, and he did not discuss any specific prior criminal incidents involving the two cars. Assuming there was any implication concerning Calhoun's involvement in any prior incidents involving the cars, it was a brief and passing reference. See *Richardson v. State*, 308 Ga. 70, 71 (2020) ("[A] passing reference

17

to a defendant's incarceration does not place his character in evidence." (cleaned up)). Under these circumstances, we see no abuse of discretion in denying the motion for a mistrial.

(b) Calhoun also appears to argue that the trial court abused its discretion when it denied Banks' motion for a mistrial (which Calhoun joined) concerning Link's testimony in response to a question about reports Link had made to the police. Link testified that he told the police he had seen the cars associated with "negative activities" in the subdivision on the day of the shooting.

The trial court denied the motion but agreed to give curative instructions. The court drafted a curative instruction with input from defense counsel. The court instructed the jury: "I want you to completely disregard the witness's testimony about other negative activities. So you are to disregard that testimony." Calhoun did not renew his motion for a mistrial. Consequently, this claim of error has been waived. *Hartsfield v. State*, 294 Ga. 883, 886 (2014) (concluding appellate review was waived when a renewed motion for mistrial was not made after the trial court gave a curative instruction).

(c) After the life-sized replica of Burke's closet had been removed from the courtroom following Officer Guin's direct testimony regarding the replica and before his cross-examination began, the defendants moved for a mistrial on the ground that they could not see the closet during the officer's testimony and this "possibly gave the jury the impression that [they] did not care" or that they were "in custody." The trial court denied the motion. On appeal, however, Calhoun asserts that a mistrial was required because, given that he could not see the closet replica, he was unable to assist his attorney "regarding the credibility of the State's presentation." Because Calhoun did not move for a

18

mistrial on this basis below, he has not preserved this argument for appeal. See *Jones v. State*, 317 Ga. 466, 472 (2023) (explaining that the failure to raise a timely motion for mistrial on the specific grounds challenged on appeal waives for appellate review any alleged error in the trial court's denial of the motion.).

5. Calhoun contends that the trial court abused its discretion in admitting in evidence the life-sized replica of Williams's bedroom closet because, even if it was relevant to any issue at trial, its probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Rule 403. He also contends that the replica was "tantamount to impermissible bolstering" because the defendants "were not able to come around and look and see the closet" replica, which gave the jury the impression they were "indifferent to the whole proceeding." We disagree.

With respect to the admissibility of the replica under Rules 404(b) and 403, we resolved this claim in *Sims*, slip op. at 16-18, holding that the probative value of the closet replica was not outweighed by any unfair prejudice. Here, Calhoun makes similar arguments and cites to the same evidence. For the same reasons that we rejected this claim of error in *Sims*, we reject it with respect to Calhoun. See id. With respect to Calhoun's bald assertion that the "evidence was tantamount to impermissible bolstering," he has failed to carry his burden on appeal of showing that the trial court abused its discretion because he has made no legal argument in support of this claim nor has he cited to any legal authority. Consequently, this claim of error fails. See id. at 14 ("As a general matter, a legal argument in support of a claim of error on appeal involves the presentation of reasoning based on

19

the law and the specific facts of the case aimed at persuading a court that the claim of error has merit.").

6. Calhoun contends the trial court abused its discretion in overruling his objections to the admission of evidence on hearsay grounds. As explained below, Calhoun has not shown that the trial court's rulings warrant reversal.

(a) Calhoun argues that the 911 operator, Sheila Hayes, should not have been allowed to testify that State's Exhibit 141 was a record documenting a call that she took regarding "suspicious activity that someone saw in the Amherst subdivision." Calhoun argues that the witness's statement that the call was about "suspicious activity" constituted inadmissible hearsay.

"The admission of evidence is committed to the sound discretion of the trial court, and the trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion." *Anglin v. State*, 302 Ga. 333, 335 (2017). "And the erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced." Id. at 336 (2); see also *Campbell v. State*, 320 Ga. 333, 343 (2024) (holding that non-constitutional error is harmless when "it is highly probable that the error did not contribute to the verdict" (citation and punctuation omitted)).

Assuming without deciding that Hayes's statement constitutes inadmissible hearsay,[5] its admission was harmless because the jury had already heard Link testify that he called the 911 operator on November 25 to report his observations

---

[5] "'Hearsay' means a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801(c).

20

concerning people he had seen driving a car that he believed was a stolen. In fact, as Link testified, the State played portions of State's Exhibit 37, a video recording from Link's dash camera that documented him following and interacting with several people, including Banks and Calhoun, on November 25. Link testified that he was concerned about certain activities in the neighborhood, including "gambling" and "weed smoking," and that he had just seen two people get out of the car he thought might be stolen and "run back through the cut," the footpath through the woods between Sims's home and Williams's home. Finally, State's Exhibits 140 and 141 had already been admitted in evidence. State's Exhibit 140 is the recording of the 911 call. State's Exhibit 141 is a report that Hayes personally created and which categorized the call at issue as "54-Investigate Suspicious Person." We see no indication in the record that these exhibits were not published to the jury or that they were published in a redacted form. Thus, assuming that the testimony about which Calhoun complains contained inadmissible hearsay, any error in admitting it was harmless. See *Anglin*, 302 Ga. at 335-336; see also *Rutledge v. State*, 298 Ga. 37, 40 (2) (779 SE2d 275) (2015) (no harm from admission of hearsay that was "largely cumulative" of other, properly admitted testimony).

(b) Calhoun contends that the following testimony from Detective Smith contained inadmissible hearsay:

Q: Yes. You can say what Ms. Vance said.

A: Okay. Ms. Vance explained that Marcus [Debarrios] was there that Saturday from 3:00 till 9:00 and did not leave, playing with her son and what not.

Q: Okay. Did you find that to be consistent with

21

what Marcus said to you?

A: No.

In his appellate brief, Calhoun does not take issue with Detective Smith repeating what Vance told him, asserting that Vance had already testified and been cross-examined on the content of her statements. However, Calhoun argued below and on appeal that it was improper for the Detective to reference "the content of [Debarrios's] conversation" with him because Debarrios had not yet testified. By responding to the prosecutor's question with "No," the Detective implied that the information he gathered from Vance about Debarrios having been at Vance's house on Saturday was inconsistent with what Debarrios told him. Although the Detective did not repeat any specific statement made by Debarrios, counsel argued at trial that the jury could infer that Debarrios had told the detective something different. In its written order, the trial court concluded that, because "this testimony did not convey what Debarrios said," the testimony did not recount "a statement" and therefore was not hearsay. The trial court also concluded that, even if the testimony was hearsay, its admission was harmless.

Pretermitting whether the trial court correctly concluded that the detective's "No" was not hearsay, we agree that its admission was harmless. "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done[.] The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kitchens v. State*, 310 Ga. 698, 702 (2021) (citations and quotation marks omitted).

In his appellate brief, Calhoun does not mention Debarrios

in his statement of facts, explain who he is or why his whereabouts on that particular Saturday were significant to his defense, or explain what harmful inferences the jury may have drawn from the detective's testimony that Vance and Debarrios told him inconsistent things. We see no indication in the transcript that Debarrios testified. We see nothing in either Calhoun's appellate brief or the trial transcript that sheds any light on how the admission of this testimony could have harmed Calhoun. Consequently, given the compelling evidence of Calhoun's guilt in this case, we conclude that it is highly probable that the detective's exceedingly brief testimony did not contribute to the verdict and, thus, was harmless. See id.

7. Calhoun argues that the trial "court erred in admitting business records as the records were irrelevant to any issue at trial." However, in his appellate brief, Calhoun does not identify the business records that he claims the trial court erred in admitting. His transcript citation does not reference a business record; rather, it references State's Exhibit 150, which is a diagram of the Amhurst subdivision. In addition, because Calhoun makes no legal argument in support of this claim of error, he has failed to carry his burden of showing error on appeal. See, e.g., *Sims*, slip op. at 14.

8. Calhoun argues that the trial court "erred in allowing witnesses to testify in violation of the rules of reciprocal discovery" of the Georgia Criminal Procedure Discovery Act, OCGA § 17-16-1 et seq.[6] Specifically, he contends that the court

[6] OCGA § 17-16-6 provides, in pertinent part:
If at any time during the course of the proceedings it is brought to the attention of the court that the state has failed to comply with the requirements of this article, the court may order the

23

should have granted a mistrial after a witness testified with respect to State's Exhibit 421, a photographic lineup that had not been produced during discovery and which contained a narrative that stated: "The facial structure and age are familiar to me of the boy who shot me." Calhoun does not identify the witness by name in his appellate brief, but it appears that he is referring to Burke because she testified about the exhibit.

The State did not question Burke on direct examination about any photographic lineups. Instead, the prosecutor only did so on re-direct after defense counsel examined Burke on her failure to make a positive identification from those lineups. During the State's redirect examination, the prosecutor showed Burke State's Exhibit 421, a photographic lineup that investigators had previously shown her on January 5, 2013. When she was shown the lineup in January, Burke was unable to positively identify the person in State's Exhibit 421 as the shooter. However, she wrote on the lineup that "the facial structure [and] age are familiar to me of the boy who shot me. Picture [No.] 5." Picture No. 5 was a photograph of Calhoun. Calhoun was given the opportunity to review the photographic lineup at trial and he had no objection to its admission.

When the trial resumed following a weekend break, Calhoun moved for a mistrial on the basis that, while multiple lineups had been turned over in discovery, State's Exhibit 421 had not. Because Calhoun did not move for a mistrial

state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances.

at the earliest opportunity in the trial court his claim that the trial court abused its discretion by denying his mistrial motion is not preserved for appeal. It is well settled that, to preserve a motion for mistrial for appellate review, an appellant must make a contemporaneous motion at the time he becomes aware of the matter giving rise to the motion.

*Compton v. State*, ___ Ga. ___, S26A0227, slip op. at 4-6 (Ga. June 2, 2025) (explaining that, failing to move for a mistrial when improper testimony is first uttered and, instead, allowing the State to continue questioning the witness about an unrelated subject before eventually objecting to the testimony and moving for a mistrial, is not "contemporaneous" under this Court's precedent (citations omitted)).

9. In two separate claims of error, which Calhoun listed as items "I" and "J" in his enumeration of errors, he asserts that the trial court "erred in allowing character evidence outside the scope of 404(b) evidence" and "erred in failing to grant the defendant's non-pattern jury charge" request. However, Calhoun did not present any briefing on these claims of error. Consequently, he has not carried his burden of demonstrating error on appeal. See, e.g., *Sims*, slip op. at 15 ("Because [the appellant] has failed to identify what evidence he claims should not have been admitted or to present a legal argument in support of this claim of error, he has not met his burden of showing that the trial court erred in this respect."). See also Supreme Court Rule 22(1) ("Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned.").

10. Calhoun contends that his trial counsel was constitutionally ineffective for failing to request a continuance to

25

thoroughly investigate and file a motion to prevent Burke's in-court identification of Calhoun as the person who shot her.[7] For following reasons, we disagree.

To prevail on his claim of ineffective assistance of counsel, Calhoun must demonstrate both that his trial counsel's performance was professionally deficient and that he was prejudiced by this deficient performance. See *Bates v. State*, 313 Ga. 57, 62 (2022) (citing *Strickland v. Washington*, 466 US 668, 687 (1984)). To establish deficient performance, Calhoun must show that trial counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id.

At trial, counsel argued that because Burke had not been able to identify Calhoun from a photographic lineup, she should not be allowed to attempt an in-court identification. The record shows that, during direct examination, the prosecutor elicited the following testimony from Burke:

> Q: Now, do you recall close in time to this event having an opportunity to sit down with someone to have them draw a sketch—

---

[7] We note that it appears from Calhoun's appellate brief that he intended to raise additional claims of ineffective assistance of counsel. However, those claims were not briefed. Consequently, Calhoun has not carried his burden of demonstrating error on appeal with respect to those claims. See *Sims*, slip op. at 15 ("Because [the appellant] has failed to identify what evidence he claims should not have been admitted or to present a legal argument in support of this claim of error, he has not met his burden of showing that the trial court erred in this respect."). See also Supreme Court Rule 22(1) ("Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned.").

A: I do.

Q. —with the facial features of the person who actually came into the closet and shot you?

A: Yes, I do. I do remember that.

Q: The person that you saw who came into your closet, as you sit here now and try to picture his face in your mind, can you tell the jurors, does he resemble anyone that you have seen or know or anything like that?

A. You mean up to this point?

Q: Up to this point.

A: Are you asking me if I see him in the courtroom?

Q: Do you?

A: I think I do.

Calhoun's counsel objected to any further testimony regarding the shooter's identity, as Burke had not made a positive out-of-court identification of her shooter. After hearing argument from the prosecutor, Calhoun's counsel asked for a recess to research and respond to the State's argument. Following the break, counsel responded and requested that Burke be questioned outside of the presence of the jury regarding whether there was any potential taint to her in-court identification. The State objected, relying on *Jackson v. State*, 335 Ga. App. 500 (2016), which held that challenges to in-court identification are to occur through cross-examination rather than being subject to court

review for reliability. The trial court recessed to consider the cases cited and, thereafter, ruled that Burke could testify and make an in-court identification if she were able, and that she would be subject to cross-examination by Calhoun. Burke then identified Calhoun as the person who shot her.

As is applicable here, a witness's in-court identification of a defendant "is subject to the same rules of evidence, witness credibility, and cross-examination as all testimony in a criminal trial." *Thorpe v. State*, 304 Ga. 266, 270 (2018) (explaining that the extra safeguards applicable to pretrial identification are not applicable to a witness's in-court identification of a defendant). Thus, a witness' failure to make a pretrial identification of the accused is not a ground for striking a subsequent in-court identification. See id.

Under the circumstances here, Calhoun has failed to show that he was entitled to a continuance in order to file a motion to prevent the in-court identification of him as Burke's shooter, nor has he shown that the trial court's ruling would have changed had a written motion been filed. Thus, Calhoun has not shown that trial counsel's performance was deficient in this respect. As we have explained, "the failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel." *Hampton v. State*, 295 Ga. 665, 670 (2014).

11. Calhoun does not argue that the errors we have assumed or pretermitted for purposes of analysis and determined individually to be harmless—the admission of hearsay testimony from a 911 operator and a detective—cumulatively resulted in prejudice mandating a new trial, and in light of the other evidence in the case, and from our review of the record, we discern no cumulative prejudice warranting reversal. See *Guyton v. State*, 321 Ga. 57, 64 n.7 (2025); see also *State v. Lane*, 308 Ga. 10, 18

28

(2020) ("[A] defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").

*Judgment affirmed. All the Justices concur.*